The finding and decision of the referee are affirmed.

---

### THE NO. K 1. THE NO. K 9. THE WM. H. FLANNERY.

#### (Circuit Court of Appeals, Second Circuit. November 7, 1906.)

#### No. 27.

1. SALVAGE—SUIT TO RECOVER COMPENSATION.

   A decree holding a tug and its employer liable for the salvage of two scows, which broke from their moorings at the end of a pier in East river, where one had been left outside the other by the tug during a strong flood tide, affirmed.

2. ADMIRALTY—SUIT FOR SALVAGE—BRINGING IN NEW PARTIES.

   In a suit in rem for salvage, the vessel proceeded against may properly be permitted, by analogy to admiralty rule 59, to bring in the vessel or individual whose neglect exposed her to the peril from which the salvors rescued her, and both a vessel and an individual may be so brought in upon proper averments showing their liability.

Appeal from the District Court of the United States for the Eastern District of New York.

La Roy S. Gore, for appellants.

Albert A. Wray, for appellee.

Before WALLACE, LACOMBE, and TOWNSEND, Circuit Judges.

LACOMBE, Circuit Judge. The Contracting Company, owner of the dumper scows, contracted with Moran for their towage. Moran, by one of his own tugs, towed K 1 to pier 36 East river, where she was tied up at the end of the pier. He engaged the Flannery (which he did not own) to tow K 9 to the same place. Upon arrival the master of the Flannery tied K 9 up on the outside of K 1, so that both of them lay breasting a strong flood tide. In about 20 minutes they broke away, and while drifting in the river were taken hold of by libelant's tug Eli B. Conine and conveyed to a place of safety. No one disputes the findings of the district judge that the tug Conine rendered a salvage service, and that $500 was a proper allowance therefor. The district judge also found that the scows broke away from the pier because of the pull of the tide, and that it was a negligent act to leave them tied up in that situation, as it was undoubtedly an unlawful act, expressly prohibited by statute. The appellants contend that the scows went adrift because of some careless loosening of their lines, that Moran had not contracted to provide other tugs than his own and was not responsible for their conduct, and that the place where

the scows were left was a safe and proper one. There is a conflict among the witnesses as to the facts (the testimony is recited in the opinion below); but the district judge saw all the witnesses, and the weight of the testimony apparently supports his findings, which, therefore, are accepted here.

The assignments of error which were principally urged upon appeal relate to questions of admiralty practice. After the tugs were libeled, their owner, the Contracting Company, filed a petition reciting the facts and its contract with Moran, and praying that a citation might issue against Moran, citing him to appear and answer, and that process issue against the tug Flannery, and the cause proceed as if Moran and the tug had been originally proceeded against. Moran and the tug each raised the objection that he and it were improperly joined; but the district judge held that the petition be sustained and decreed recovery by the salvor against both—one-half against each. The practice followed is similar to that provided for in the fifty-ninth admiralty rule, which rule was itself a recognition of the practice already approved by Judge Brown in The Hudson (D. C.) 15 Fed. 162, for collision cases. It has been approved in salvage cases by the District Court in the Southern District of New York (Dailey v. City of New York [D. C.] 119 Fed. 1005), and undoubtedly tends to avoid a multiplicity of suits, while doing no apparent injustice to any one. It is true that the fifty-ninth rule is in terms restricted to cases of collision; but rule 46 accords to the District Courts so wide a discretion in regulating their practice that there seems to be abundant authority for allowing the vessel proceeded against for salvage to bring in the vessel or individual whose neglect exposed her to the peril from which the salvors rescued her.

It is, however, insisted that it is contrary to well-settled principles of admiralty practice thus to bring in both a vessel and an individual, one of whom must be proceeded against in rem and the other in personam. In support of this contention reference is first made to several rules in admiralty. Rule 12 provides that in suits for supplies or repairs libelant may proceed against ship and freight in rem, or against master or owner alone in personam. Rule 13 provides that, in suits for mariners' wages, libelant may proceed against ship, freight, and master, or against ship and freight, or against owner or master alone in personam. Rule 14, that in suits for pilotage libelant may proceed against ship and master, or against the ship, or against owner alone or master alone in personam. Rule 15, that in suits for damage by collision libelant may proceed against ship and master, or ship alone, or against master or owner alone in personam. Rule 16, that in all suits for assault on the high seas the suit shall be in personam only. Rule 17, that in suits upon a mere marine hypothecation libelant may proceed either in rem or against the master or owner alone in personam. Rule 18, that in suits on bottomry bonds the suit shall be in rem only. Rule 19, that in suits for salvage the suit may be in rem against the property saved, or its proceeds, or in personam against the party at whose request and for whose benefit the salvage service has been performed. But all of these provisions manifestly refer to single interests. The master, freight, and owner mentioned are the

master, freight, and owner of the particular individual ship proceeded against. The rules point out how such interest shall be proceeded against, and require a choice of one mode or another. There is nothing to preclude a similar choice of procedure if another interest is involved in the same controversy. Thus, if a libelant is injured by the independent, but concurrent, negligence of ships A, B, and C, there is nothing in the rules which forbids his proceeding against all three offenders in the same suit; and if, under rule 15, he proceeds against ship A in rem, there is no apparent reason why he may not proceed against the owner alone of ship B, and against ship C and her master.

The appellants' counsel cites many cases in opposition to this proposition. None of them appear to be applicable, save one, The Young America, 1 Brown's Adm. 462, Fed. Cas. No. 18,178, in which Judge Longyear, at the end of a long opinion, intimates that, where three vessels were in fault, libelant could not join in one suit proceedings in rem against the two vessels and in personam against the owner of the other. The question, however, was not fairly before him. He had to determine whether, after a proceeding had been begun in rem against all three, the libelant should be allowed to amend by substituting her owners for one ship and then proceeding against them in personam. All that his opinion decides is that such amendment should not be allowed. The practice followed in the case at bar seems to be so well settled in the districts of this circuit, it is so expeditious and convenient, and tends so much to avoid multiplicity of suits, that we should feel averse to condemning it, unless the rules of admiralty were more specific in their disapproval than they are, or the authorities more constraining than are those to which our attention has been directed.

The decree is affirmed, with interest, but without costs to libelant, and with interest and costs to the petitioner against the appellants.

NOTE.—The following is the opinion of Thomas, District Judge, on the hearing below:

THOMAS, District Judge. On the morning of March 18, 1904, at about 8 a. m, the tug Flannery, returning from sea with scow K 9, placed her outside of scow K 1, which had been moored the same morning, or the previous evening, at the end of pier 36. The scows had been and were to be used in connection with a dredge that lay near the bulkhead on the north side of the slip, between pier 36 and the pier northerly thereof, and about 125 to 150 feet from the ends of the piers. The width of the slip was 213 feet. Copeland, the master of the dredge, testified that when K 9 was moored he called through a megaphone that it was not a fit place to leave the dumpers, as the tide was too strong, but that no reply was received, and that about 10 minutes thereafter the Flannery went up the river, and that between 8 and 9 o'clock a. m. the scows broke away. The mate of the dredge testified that he heard Copeland-call to the captain of the Flannery to bring in K 9, or both scows, as he afterwards stated. Both these witnesses testify that there was sufficient room in the slip for the K 9. The captain of the Flannery testified that he did not hear anything from Copeland, and the pilot of the Flannery said that there was no call from the dredge. Burg, the master of K 1, testified that he told the captain of the tug "to put the K 9 into the slip, because the tide was running too strong for two empty scows to be there," and confirms the evidence of the captain and mate of the dredge as above given. At the time K 9 was landed, the pilot was on watch, although the captain immediately came up. Nobody on the Flannery gave any attention to the mooring or to the lines of

150 F.—8

either scow. Both the captain and the pilot of the Flannery state that the slip was so occupied that it was dangerous to put the scow in the slip on the prevailing flood tide. The pilot stated that he would not have put K 9 in the slip on that tide, even though it were not blocked. The captain of the Flannery testified that his tug was made fast to K 9 and lay there about an hour, and his pilot confirms him in this. Conine, the libelant, who performed the salvage service about to be stated, testified that the scows broke away from 20 to 30 minutes after the Flannery landed scow K 9. The evidence on the part of the Flannery is that it was customary to land dumpers on the outside of the pier, and to place one outside of the other, so that two or three often lay there together. The scows broke away, and the libelant, in charge of the tug Conine, having moored the float which he had in tow, after one of the drifting scows had collided with it, pursued the scows and secured them near the Brooklyn shore, putting his tug between them for the purpose. He testified that he had difficulty in arresting their progress on the flood tide, and that there was great danger of collision with the easterly abutment of the Williamsburgh Bridge, but that he swung them around from port to starboard, avoiding the abutment, and brought them back and tied them up at the end of pier 36, tying together the broken lines and using them again for the purpose of mooring. He places the length of his service at from 2 to 2½ hours. He states that the lines of K 1 were very bad. The mate of the Conine also states that the lines that parted were bad—that they were pretty rotten; and a deckhand on the Conine, whose evidence adds little, made a similar statement. The value of the scows was $14,000.

The question is, what should be the salvage award, and who should pay it? It is thought that $500 is sufficient for the service. It is evident that it was customary to moor dumpers at the end of the pier, although it was unlawful to do so. The lines of K 1 were sufficient for herself, but it is evident that they were not good enough for the continued holding of both scows, although they may have been strained by the Flannery's added burden. It is evident that K 1 would not have gone adrift if she had not been burdened by K 9. But the Flannery, in the employ of Moran, added K 9 to K 1, and placed the additional strain on the line. There is no reason why the risk should be placed on K 1, or, indeed, on K 9. Even if K 1 did not object, and her master insists that he did, the responsibility was on the master of the Flannery, as he was a navigator and the scow captain was not. Hence the master of the Flannery was the better judge of the propriety of trusting the two scows to the lines of K 1 and leaving them exposed to the action of the tide. Such conduct on the part of the Flannery does not seem prudent, and it is concluded that the libelant's decree against the scows for the salvage, which is fixed at $500, should, as between the scows and Flannery and Moran, be borne by the tug and Moran.